**In re Dennis R. GALLIGAN, Peggy Galligan, Debtors.**

**Dennis R. GALLIGAN, Peggy Galligan, Plaintiffs,**

**v.**

**GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant.**

**Bankruptcy No. BK–78–627/8. Adv. No. 280–0102.**

United States Bankruptcy Court, D. Maine.

May 5, 1981.

842

George A. Hess, Auburn, Maine, for plaintiffs.

Donald Kopp, Portland, Maine, for defendant.

## MEMORANDUM DECISION

FREDERICK A. JOHNSON, Bankruptcy Judge.

In this adversary proceeding the Plaintiffs (Debtors) seek to recover a repossessed motor vehicle from General Motors Acceptance Corporation or in the alternative, damages suffered because of an allegedly wrongful repossession and resale. The Plaintiffs also ask the Court to disallow GMAC's claim in the amount of $3,411.81.

The Court finds that all of Plaintiffs' contentions are without merit.

## FINDINGS OF FACT

The Debtor, Dennis R. Galligan, purchased a 1975 Cadillac Sedan deVille, from a Portland auto dealer on May 3, 1977 for $7,922.24. He made a down-payment of $1,294.74 and financed the remaining portion under an installment sales contract which the dealer later assigned to GMAC.

Mr. Galligan was obligated under the contract to make monthly installment payments of $246.21 commencing June 17, 1977. The contract gave GMAC the right to declare a default if its prospect of payment or performance by the debtor, or its prospect

of realizing its balance due from its collateral became significantly impaired.

Shortly after purchasing the vehicle, sometime in May, 1977, the Debtors moved to Detroit, Michigan, to accept employment. GMAC received Mr. Galligan's first payment on June 10, 1977, seven days prior to its due date. Debtor's second payment, due July 17, 1977, had not been made on August 10, 1977. GMAC, therefore, prepared and mailed to Mr. Galligan a notice, dated August 10, 1977, stating that his account was $252.71 in arrears [1] and that he had a right to cure his default within 20 days from the date of the letter.[2]

GMAC's notice to cure letter was apparently forwarded from Debtor's Canton, Maine address to his residence in Michigan. It was received at the Southland, Michigan Post Office on August 19, 1977 and was personally delivered to the Debtor on August 20, 1977.

On August 23, 1977, Mr. Galligan exercised his right to cure his default by making the late July payment. On August 29, 1977, the Debtor made the payment that had come due August 17, 1977. No further payments were made.

Sometime in September of 1977 the Debtors returned to Maine after Mr. Galligan lost his job in Michigan.

After Mr. Galligan failed to make payments due in September and October, a GMAC representative called him to discuss the late payments. The Debtor stated that he could not come to Portland to discuss the matter because his car had two flat tires and he was suffering from a disability. He suggested that the GMAC representative come to his home in Canton.

On November 3, 1977 GMAC representative, Paul Young, travelled to Canton and spoke with the Debtor at his home. At that time the Debtor informed Mr. Young that he was unemployed and that he could probably not resume regular payments until the Spring of 1978. Mr. Young told the Debtor that GMAC could not reduce the monthly

1. This figure includes a late charge of $6.50.

2. The letter is set out in full in an appendix to this decision.

payments or wait until Spring for regular payments. Mr. Young suggested that the Debtor return the vehicle to GMAC's office in Portland. The Debtor told Mr. Young that he could not deliver the car to Portland; but he agreed to repair the tires and drive it to Lee Cadillac-Olds in Auburn, Maine. He testified that he only agreed to return the car because he felt he had no other choice.

Mr. Galligan drove the vehicle to Lee Cadillac-Olds on November 3, 1977 and left it there. He testified that when he delivered the car it had two new tires, was in good-to-excellent condition and was worth about $7,000.

Mr. Young, the GMAC representative, examined the car on November 15, 1977 and filled out a repossession report. He observed that the vehicle had a cracked grill and two flat tires and estimated that the car had a dealer value of $2,500.

On November 21, 1977 the vehicle was driven to GMAC's indoor garage in Portland. GMAC immediately ran a legal advertisement in the Portland Press Herald noticing a public sale of the vehicle. The sale was scheduled for December 7, 1977 at 10:00 a. m. at GMAC's office in Portland.

On November 23, 1977 GMAC sent two letters to Mr. Galligan. The first letter informed him that he would be responsible for any deficiency after the sale of the vehicle. GMAC urged the Debtor to contact GMAC's Credit Department to discuss his account. The second letter informed the Debtor that he could redeem his car and reinstate his installment sales contract by paying $779.63 (three past due installments plus default charges and costs of repossession) any time prior to the public sale. This notice informed the Debtor of the date, time and location of the proposed public sale. The Debtor did not respond to these letters. .

On December 2, 1977, in order to generate interest in the vehicle, a GMAC employee drove it to six or seven automobile dealers in the Portland area and received bids from three of them for $2,400, $2,800 and $3,000. Several interested parties also viewed and test drove the vehicle at GMAC's garage. In order to show the car it was necessary to repair two flat tires and replace the alternator after the vehicle failed to start when it was being shown to a prospective buyer.

On December 5, 1977 GMAC sent another letter to the Debtor urging him to contact GMAC to reach a "mutually satisfactory arrangement for payment." Debtor did not respond to this letter.

The Debtor did not appear at the December 7th public sale; nor did any bidders. GMAC took the vehicle for its bid of $3,000 based on the highest bid it had generated prior to the public sale.

Lack of public demand for this type of car was caused by the severe gasoline shortage and rapid increase in price of motor fuel which occurred during this period.

After the public sale GMAC continued with its efforts to sell the vehicle. GMAC had it professionally cleaned and waxed and placed advertisements under "autos for sale" in the classified section of Portland newspapers. Finally, during January of 1978, GMAC received an offer of $3,525 from a local auto dealer.

Again, on February 1, 1978, GMAC wrote to the Debtor informing him of the $3,525 offer and reminding him of the sizeable deficiency. The letter gave the Debtor "this last opportunity to redeem the car; and we certainly urge you to do so . . . we will withhold disposing of the car until February 8th to give you an opportunity to contact us. . . ." Again, the Debtor failed to respond.

On March 21, 1978 GMAC sold the car to a local auto dealer for $3,525.[3] The entire $3,525 was credited to the Debtor's account, leaving a deficiency of $3,411.81.

---

3. The New England Edition of the N.A.D.A. official used car guide for March 1978 lists the wholesale value at $3,950.

844

## CONCLUSIONS OF LAW

I. *Alleged Consumer Credit Code Violations.*

Debtors allege two violations of Maine's Consumer Credit Code. They contend that GMAC incorrectly informed Mr. Galligan of his right to cure by stating that he could cure within twenty days of the date of the *letter* rather than twenty days of the date of *mailing* as indicated by the letter's postmark.[4] Debtors also contend that GMAC failed to conspicuously set forth certain information in the notice of right to cure.[5] Debtors contend that since this notice of right to cure was defective, as given in August, no notice of right to cure had been given to Mr. Galligan 20 days prior to the repossession in November as required by 9–A M.R.S.A. § 5–111.

Specifically, the Debtors argue that Mr. Galligan was misled because of GMAC's letter of August 10, 1977 contained the following:

You have a right to cure this default within 20 days from the *date of this letter.*

They base their argument on the language of 9–A M.R.S.A. § 5–110.1 which in 1977 provided:

A creditor gives notice ... when he delivers the notice to the consumer or *mails the notice* to him at his residence.

The Debtors argue that the letter should have informed the Debtor as follows:

You have a right to cure this default within 20 days from the *mailing of this letter.*

The Debtors point out that the letter could be dated August 10th and not mailed until August 15th. However, the evidence in the case does not bear this out and the Court finds that the letter was mailed on August 10th, the day it was written. It was mailed to Mr. Galligan's Canton, Maine, address and forwarded to Michigan. The evidence discloses that it was received in Michigan on August 19th and delivered to the Debtor on the next day, August 20th.

The Debtors also argue that the letter does not precisely follow the recommended form set out in 9–A M.R.S.A. § 5–110.2, in that it fails to highlight the "LAST DAY FOR PAYMENT" and "AMOUNT NOW DUE" by using capital letters. The Court finds that the August 10th letter conforms substantially with the recommended form, ·which is all that the statute requires and that it contains all of the information required.[6]

In any event, the Debtors' assertion that Mr. Galligan could be misled by GMAC's notice is untenable because the evidence discloses that he was not. He paid the "AMOUNT NOW DUE" before the "LAST DAY FOR PAYMENT" shortly after receipt of the notice.[7]

---

4. 9–A M.R.S.A. § 5–110.1 as it existed in 1977 provided:
   A creditor gives notice ... under this section when he delivers the notice to the consumer or mails the notice to him at his residence....

5. 9–A M.R.S.A. § 5–110.2 as it existed in 1977 provided:
   Except as provided in subsection 3, the notice shall be in writing and shall conspicuously state the name, address and telephone number of the creditor to whom payment is to be made, a brief identification of the credit transaction, the consumer's right to cure the default and the amount of payment and date by which payment must be made to cure the default....

6. The statute provides:

   a notice in substantially the following form complies with this subsection: .... 9–A M.R.S.A. § 5–110.2.

7. It should be observed that a notice to cure may not have been required in any event. A notice to cure is not necessary if the consumer has voluntarily surrendered possession of the collateral, 9–A M.R.S.A. § 5.110.1, or if the consumer is in default in some manner other than "only of ... failure to make a required payment...". 9–A M.R.S.A. § 5–111.1. Whether or not Mr. Galligan's surrender of the vehicle was voluntary or whether or not he was in default in some manner other than failure to make a required payment was not strenuously argued by counsel and the Court expresses no opinion on these issues.

## II. *Alleged Uniform Commercial Code Violation.*

Debtors contend that GMAC's disposition of Mr. Galligan's repossessed car was in violation of Section 9–504(3) because it was not commercially reasonable. Plaintiffs make this contention based on the $5,500 price discrepancy between the amount for which Mr. Galligan bought the car in May, 1977 and the amount for which the car was sold in December of 1977, after it had been driven only 9,000 additional miles. Plaintiffs additionally object to the reasonableness of the sale because a GMAC employee, rather than a professional auctioneer, conducted the sale. Finally, the Plaintiffs contend that the method of advertisement of the sale was inadequate since it was in the legal notices and said nothing about the car's condition or its added features.

Section 9–504(3) of Maine's version of the Uniform Commercial Code provides that the disposition of repossessed collateral:

> . . . may be by public or private proceedings . . . at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. . . 11 M.R.S.A. § 9–504(3).

11 M.R.S.A. § 9–507(2) provides in pertinent part:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold, he has sold in a commercially reasonable manner. . . .

The burden of proving the commercial reasonableness of the disposition of collateral under 11 M.R.S.A. § 9–504(3) is on the secured party, at least in situations where the secured party is seeking a deficiency. *See* Annot., 59 A.L.R.3d 369 (1974).

GMAC has met its burden of proving the commercial reasonableness of its disposition of Mr. Galligan's vehicle.

GMAC's efforts to resell the car repossessed from Mr. Galligan began November 21, 1977, 18 days after it had been dropped off in Lewiston by Mr. Galligan. GMAC ran an ad in the legal advertisements of the Portland Press Herald, setting a sale date for December 7, 1977 at 10:00 a. m. Before the sale date, GMAC notified Mr. Galligan of the date, time and place of the proposed public sale. GMAC prepared the car for sale by repairing the tires and the engine. A GMAC representative sought to generate interest in the vehicle by driving it to six or seven automobile dealers in Portland. Three of these dealers made bids for the vehicle. Several other interested parties also viewed and test drove the vehicle in response to GMAC's advertisement.

Despite these efforts, no bidders appeared at the December 7, 1977 sale date. GMAC bid in the vehicle at $3,000 but subsequently received $3,525 after further solicitations of bids, further advertising in the classified ads and further efforts to improve the car's appearance. This amount was credited to Mr. Galligan's account.

The sale by GMAC was in conformity with reasonable commercial practices among wholesale dealers in used cars.[8] GMAC's procedure of contacting local auto dealers and placing advertisements in the local newspaper was a reasonable one under the circumstances.

GMAC's sale does not lose its commercially reasonable character because of the price

---

**8.** Comment 2 to 11 M.R.S.A. § 9–507 suggests that the wholesale market is the appropriate measure in situations like that before the Court:

> . . . One recognized method of disposing of repossessed collateral is for the secured party to sell the collateral to or through a dealer—a method which in the long run may realize better average returns since the secured party does not usually maintain his own facilities for making such sales.

**846**

discrepancy between the sale price and the price Mr. Galligan paid seven months earlier. The value of this large vehicle dropped substantially at this time because of the severe gas shortage and rapidly increasing price of motor fuel. The appraisals by GMAC's experienced appraiser indicated the vehicle had a value of approximately $2,500 at the time of repossession. The highest solicited bid prior to the December, 1977 sale was $3,000. The highest bid solicited as of March 21, 1978 was $3,525. In the light of GMAC's efforts to sell the vehicle, the various estimates of value, and the fact GMAC credited Mr. Galligan with $3,525, it cannot be said that the price obtained rendered the sale commercially unreasonable.

An appropriate order will be entered.

APPENDIX *

August 10, 1977

Dennis R. Galligan
Box 422
Canton, ME 04221

Account No. ___0300  71479___

RE: Installment Sale Contract— 1975 Cad. Sed. Deville

The serious past due condition of your account has not been resolved. Our records indicate your account is in default for $252.71.

You have a right to cure this default within 20 days from the date of this letter. If you do so, you may continue with the contract as though you did not default. Your failure to cure your default by August 30, 1977 will permit us to retake the goods or to take(sic) other legal action.

GMAC is mostinterested(sic) in your efforts to cure this default condition, and we will extend every possible consideration to you. Therefore, even though you intend to cure this default within the prescribed 20 days, we would still appreciate your call so that we know your intentions.

* It was stipulated between the parties that this letter appeared on GMAC stationery which

Very truly yours,

/s/ R. O. Looke

R. O. Looke
Credit Department

afl

contained the address and telephone number of GMAC's Portland office.